IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION


CATRINA LOUISE HILBURN                                                    PLAINTIFF

v.                                    Civil No. 10-3074


MICHAEL J. ASTRUE, Commissioner of
Social Security Administration                                           DEFENDANT


MEMORANDUM OPINION

## I.      Factual and Procedural Background

Plaintiff, Catrina Louise Hilburn, appeals from the decision of the Commissioner of the Social Security Administration denying her claims for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"), pursuant to §§ 216(I) and 223 of Title II of the Social Security Act, 42 U.S.C. §§ 416(I) and 423(d), and § 1602 of Title XVI, 42 U.S.C. § 1381a, respectively (collectively, "the Act").  42 U.S.C. §405(g).

Plaintiff protectively filed her DIB and SSI applications on March 19, 2007, alleging a disability onset date of August 1, 2003, due to depression, anxiety with panic attacks and attention deficit hyperactivity disorder.  T. 103-113, 127, 169.   At the time of the onset date, Plaintiff was twenty two years old and possessed a General Equivalency Degree.  T. 126, 131. She had past relevant work as a dishwasher, waitress and cook.  T. 36.  Plaintiff's applications were denied at the initial and reconsideration levels.  T. 56, 59, 65, 67.  At Plaintiff's request, an administrative hearing was held in Harrison, Arkansas, on October 1, 2008, at which Plaintiff, a

lay witness[1], and a vocational expert testified.  T. 9-39.   At the hearing, Plaintiff amended her onset date to June 14, 2005.  T. 11.  Administrative Law Judge ("ALJ") Larry D. Shepherd issued an unfavorable decision on November 26, 2008, finding that Plaintiff was not disabled within the meaning of the Act.  T. 48-55.  On July 16, 2010, The Appeals Council found no basis to reverse the ALJ's decision. T.1. Therefore, the ALJ's November 26, 2008, decision became the Commissioner's final administrative decision.

## II.   <u>Medical History</u>

Plaintiff first sought treatment for mental illness on October 23, 2001, when she presented at Ozark Counseling Services, Inc. (OCSI) describing symptoms of decreased appetite, insomnia, excessive worry, crying, chronic guilt, low self-esteem, feelings of hopelessness, increased irritability, especially with her children, and chronic passive dependent relationship style.  T. 330.  During her intake evaluation she was provisionally diagnosed by  licensed clinical social worker Mike Streett with generalized anxiety disorder, dysthymic disorder, and dependent personality disorder.  The social worker noted a history of untreated high blood pressure, primary support conflict and economic problems and assigned a GAF  score of 50[2].  She was referred for psychiatric evaluation and individual therapy.  T. 331.  Two weeks later she met with Stephen Austin, M.D. at OCSI for a psychiatric evaluation.  T. 228-230.  Plaintiff reported that she was depressed, always upset and usually crying.  When she gets mad, she yells at her kids.  In his mental status examination, Dr. Austin noted Plaintiff appeared sad and anxious, maintained poor

---

[1] The ALJ determined that Jessie Tibbits' testimony was only brief and cumulative and added little to the evaluation of the claimant's allegations.  T. 53.

[2] According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000), the Global Assessment of Functioning Scale is used to report "the clinician's judgment of the individual's overall level of functioning." GAF scores of 41 to 50 reflect "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Manual* at 34. GAF scores of 51-60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.*

eye contact, denied hallucinations and had no suicidal or homicidal ideations.  He estimated her intelligence to be average to slightly above average and confirmed the previous diagnoses.  T. 229, 230.  Plaintiff reported to Dr. Austin that she was attending Arkansas State University and that she was making good grades.  T. 129.  He added primary support conflicts to her history and prescribed Doxepin for Plaintiff's insomnia and advised her to continue treatment with Mike Street.  T. 230.  Her treatment plan with Mr. Streett included the goal of increasing her self-esteem and learning to function without being dependent on a man.  T. 300.

There are no records of treatment in 2002.

On May 19, 2003, Plaintiff was evaluated again at OCSI by Debora Murphy, M.D. Plaintiff complained of panic, poor appetite, nightmares, headaches and stomachaches.  Dr. Murphy wanted to rule out post-traumatic stress disorder related to Plaintiff's sexual abuse as a child and physical abuse as an adult and noted that Plaintiff was to continue therapy to work on social skills, verbal skills, family stability, cognitive processing, medication management, parenting, leisure, and judgment skills. T. 258.  At her May 22, 2003, therapy session with Mr. Streett, Plaintiff reported increased anxiety and worry over the years along with problems associated with being an abuse victim.   Her therapy goals were to decrease anxiety and improve overall behavior and stress management.  T. 299.  On May 29, 2003, Plaintiff reported to Dr. Austin continuing stress and anxiety.  T. 231.  Dr. Austin added partner relational problems to her diagnoses and prescribed Paxil and continued treatment with Beth Kennedy, MSW.  T. 232.

On September 2, 2003, Plaintiff reported ongoing panic attacks and Ms. Kennedy assessed her progress as moderate—although she was not journaling or using proper relaxation techniques, she had begun classes at ASU.  T. 298.  On September 11, 2003, Dr. John Walters, psychiatrist, saw Plaintiff for a medication review and treatment plan update.  Plaintiff reported

panic with hyperventilation, excessive worry and tension.  Dr. Walters noted that Plaintiff had discontinued Lexapro[3] one month ago because it was causing her to "scratch emotional liability" and she was not benefitting from it.  He wanted to rule out panic disorder and prescribed Ativan (anti-anxiety) and Effexor (anti-depressant).  T. 233.  On October 9, 2003, Plaintiff reported that she was experiencing no side effects from her medication, but that the Effexor wasn't helping and the Ativan was.  Dr. Walters increased dosage of both medicines.  T. 234.  On November 5, 2003, Ms. Kennedy noted Plaintiff had attended two out of four anger management classes and was not using relaxation techniques.  T. 297.  On November 13, 2003, Plaintiff reported no side effects from her medications and that she felt significantly better since the Effexor was increased.  She was tolerating stress better and enjoying things more.  Dr. Walters increased her Effexor again, continued her Ativan, and advised her to return in three months.  T. 235.

On February 12, 2004, Plaintiff reported that the Effexor was helpful but the Ativan was not helping her anxiety attacks.  Dr. Walters continued the Effexor, discontinued the Ativan and prescribed Valium for anxiety.  T. 236.  On May 20, 2004, Plaintiff was "feeling okay, as far as her anxiety and depression [were] concerned.  She [was] satisfied with her current medications…with no side effects."  James Boydstun, M.D. diagnosed her dysthymic disorder as in fair remission and her generalized anxiety disorder as adequately controlled with current doses of Valium.  Dr. Boydstun prescribed Effexor and Valium.  T. 237.  On October 14, 2004, Plaintiff reported panic attacks, insomnia and a preoccupation with her safety.  Dr. Murphy continued her Effexor and Valium and advised continued therapy and medication monitoring.  T. 238.

On January 3, 2005, Plaintiff stated she was "doing poorly on her medications."  She was glad to see Dr. Austin and requested help with assertiveness.   Dr. Austin referred her to a

---

[3] The records show that Dr. Austin prescribed Paxil on May 29, 2003.

therapist, increased her Effexor and prescribed Valium.   T. 240.  On March 22, 2005, Plaintiff reported she was having no problem with anxiety or depression; she was sleeping well and had a good appetite.  Dr. Austin prescribed Effexor and Valium.  T. 241.

On May 30, 2005, Plaintiff went to Baxter Regional Medical Center complaining of shortness of breath and anxiety.  Dr. John Black, emergency room physician, diagnosed anxiety and prescribed Valium and Phenergan (sedative).  T. 198.

On June 14, 2005, Plaintiff reported she was doing well on her medications. Dr. Austin suspected she might have ADHD because she had a decreased attention span, was unable to pay attention to details, did not appear to listen, was restless and talked excessively.  In addition, she had a family history of ADHD and both her daughters were being treated for the condition.  He prescribed Effexor, Valium and Adderall (amphetamine used to treat narcolepsy and ADHD).  T. 242.  On September 25, 2005,   Plaintiff reported stressors at home, including the deaths of two grandmothers, her daughter was on probation, and Plaintiff was unemployed.  She told Dante Durand, M.D. that she was looking for a job in any place but a factory.  Dr. Durand advised psychoeducation and supportive services and prescribed Effexor, Valium and Adderall.  T. 244. On December 15, 2005, Plaintiff told Dr. Durand that she was going to divorce her husband because he verbally and physically abused her.  She was "doing fairly well despite the stress."  T. 248.

On March 2, 2006, Plaintiff was doing "very well"; she had met a truck driver who wanted to marry her.  She was at her baseline, stable, with no problems.  Dr. Durand prescribed Effexor, Valium and Adderall and encouraged psychoeducation.  T. 249.  On April 27, 2006, Plaintiff stated she was doing well on her medication and had a good attention span; she was sleeping well and had a good appetite.  Dr. Austin prescribed Effexor, Valium and Adderall.  T.

250.    On June 22, 2006, Plaintiff went to OCSI for her regular checkup but Dr. Austin was not there.  She reported that she had been doing well except for when she ran out of Xanax[4] for a week and got agitated and acted "real crazy."  Lauri Patterson, R.N., advised that Dr. Austin ordered continued Effexor, Valium, and Adderall.  T. 325.

On January 22, 2007, Plaintiff received counseling from Diane Martaus, LCSW.  She expressed goals of learning new parenting skills and keeping her children.  Ms. Martaus noted Plaintiff was energetic, outgoing and had poor insight.  T. 254-256.    On February 22, 2007, Plaintiff was upset because one of her daughters had been taken by juvenile services.  She was sleeping well and Dr. Austin noted her mood as non-depressed.  He prescribed Valium, Adderall and Effexor.  T. 311.   On April 12, 2007, Plaintiff went to the emergency room at Baxter Regional Medical Center after having a panic attack during parenting class.  Dr. Jamie Pritchard diagnosed her with anxiety and prescribed Ativan.  T. 261.  On May 17, 2007, Plaintiff reported she was doing well on her medications.  Her children had been taken away from her after she tested positive for amphetamine use.  She said she was sleeping well and Dr. Austin noted her mood was non-depressed.  Dr. Austin prescribed Valium, Adderall, and Effexor.  T. 312.

On June 27, 2007, Plaintiff underwent a consultative exam with Charles Nichols, Psy. D., of the Family Psychological Center.  T. 265-270.  Plaintiff told Dr. Nichols that she was undergoing court-ordered therapy at OCSI and that her medications have been effective in reducing her symptoms.  She said that Valium calms and relaxes her during panic attacks, Adderall improves her concentration and attention span, and Effexor has reduced her emotional sensitivity and crying episodes.  T. 266.  Plaintiff told Dr. Nichols that she drives daily, "running errands and things," shops for groceries and household products, makes daily trips to visit friends in their homes and regularly cleans her bedroom and helps with laundry and dishes at home.  She

---

[4] The records show Plaintiff had been prescribed Valium for anxiety, not Xanax.

reported making mostly Bs in her college courses.  T. 266.  Dr. Nichols recorded that Plaintiff

was chatty and animated, acting immature and "almost adolescent-like in terms of her emotional

and social expressions."   He noted further:

> Contrary to her report of frequent depression, the claimant's interview affect is
> cheery and positive.  She smiles and makes quips and jokes constantly, although
> humor is fairly immature.  She shows no clear signs of emotional distress (e.g.,
> tearfulness, agitation, overactivity/restlessness).  T. 267.

Dr. Nichols found that Plaintiff's reported recurrent panic attacks appeared to be mostly

random and that she did not report symptoms consistent with agoraphobia.  He determined her

depressive symptoms did not appear to meet the diagnostic criteria for major depressive disorder.

He diagnosed her with panic disorder without agoraphobia; depressive disorder not otherwise

specified, attention deficit/hyperactivity disorder, predominately inattentive type; and assigned a

GAF score of 50-55.  Dr. Nichols assessed moderate impairment of activities of daily life

functioning, poor mental efficiency, consistent concentration, and adequate pace.  Although he

did not suspect exaggeration of symptoms, he noted that her allegations did not appear to be

consistent with her presentation during the interview.   T. 269.

On July 18, 2007, Agency Specialist Kay Cogbill reviewed Plaintiff's medical records

and completed a Psychiatric Review Technique form.  She found Plaintiff to have mild

restriction of activities of daily living, moderate difficulties in maintaining social functioning,

moderate difficulties in maintaining concentration, persistence or pace, and no episodes of

decompensation.  T. 285.  Dr. Cogbill assessed a rating of unskilled.

On August 9, 2007, Plaintiff had no complaints at her OCSI medication check; she

reported sleeping well and good appetite with no side effects.  Dr. Austin prescribed Valium and

Adderall.  T. 313.

On October 11, 2007, Agency Specialist Dr. Brad Williams reviewed all of the evidence and affirmed Dr. Cogbill's assessment.  T. 316.

On November 8, 2007, Plaintiff saw Joel Price, M.D. for the first time at OCSI.  Dr. Price noted she was minimally hygienic and spoke in a "whiny little girl type voice."  Although he did not see the need for the combination of uppers and downers Dr. Austin had been prescribing for Plaintiff, since he was "not going to be her regular physician forever" he continued her prescriptions for Valium, increasing the dosage, Effexor and Adderall.  He did not discuss the risks and benefits of her medications with her at that time because she did not have the insight to understand it.  T. 334.

On May 29, 2008, Plaintiff reported to Dr. Price that she was experiencing severe mood swings.   Dr. Price noted she was more hygienic than her previous visit and spoke in a slightly more mature voice.  She did not seem very remorseful over the loss of her children to state custody.  He prescribed Valium, Adderall, and Effexor and added Lamictal, a mood stabilizer used to treat bipolar disorder.  T. 335.

On May 29, 2008, Dr. Price and Ms. Martaus completed a Medical Source Statement concerning Plaintiff's mental impairment.  They found her to be markedly limited in  the abilities to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration  for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and to respond appropriately to criticism from supervisors; get along with co-workers or peers

without unduly distracting them or exhibiting behavioral extremes; set realistic goals or make plans independently of others.  T. 326-327.

III.   **Applicable Law**

The Court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole.  *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2003).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support a conclusion."  *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)).  In determining whether evidence is substantial, the Court considers both evidence that detracts from the Commissioner's decision as well as evidence that supports it.  *Craig v. Apfel*, 212 F.3d 433, 435-36 (8th Cir. 2000) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)).  If, after conducting this review, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Secretary's] findings," then the decision must be affirmed.  *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (quoting *Siemers v. Shalala*, 47 F.3d 299, 301 (8th Cir. 1995)).

To be eligible for disability insurance benefits, a claimant has the burden of establishing that he is unable to engage in any substantial gainful activity due to a medically determinable physical or mental impairment that has lasted, or can be expected to last, for no less than twelve months.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); 42 U.S.C. § 423(d)(1)(A).  The Commissioner applies a five-step sequential evaluation process to all disability claims: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits his physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a disabling

impairment listed in the regulations; (4) whether the claimant has the Residual Functional Capacity ("RFC")  to perform his past relevant work; and (5) if the claimant cannot perform his past work, the burden of production then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform given his age, education, and work experience.  *Pearsall*, 274 F.3d at 1217; 20 C.F.R. § 404.1520(a), 416.920(a).  If a claimant fails to meet the criteria at any step in the evaluation, the process ends and the claimant is deemed not disabled.  *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004).

**IV.**   **Discussion**

The ALJ determined that the claimant met the insured status requirements through September 30, 2007, that she had not engaged in substantial gainful activity since June 14, 2005, and that she had severe impairments of depression, anxiety disorder and attention deficit hyperactivity disorder (ADHD).  T. 50.  The ALJ found, however, that the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  T. 50.   The ALJ further found that Plaintiff's allegations regarding her limitations were not fully credible, and that the Plaintiff, having no exertional limitations, retained the residual functional capacity to perform unskilled work where interpersonal contact is incidental to the work performed.  T. 51.

Plaintiff filed this claim contending that the ALJ: erred in failing to use the special procedure in evaluating mental impairments, failed to give appropriate weight to the opinion of the treating specialist, and gave a defective hypothetical question to the Vocational Expert that failed to include limitations resulting from the severe mental impairments.  Pl.'s Br. at 2.

**A.  The ALJ Properly Evaluated Plaintiff's Mental Impairments**

At the initial and reconsideration levels of the administrative review process, the SSA completes a standard document to record how it applied the Psychiatric Review Technique (PRT). The Psychiatric Review Technique Form (PRTF) consists of a heading and four sections: Section I – Medical Summary; Section II – Documentation Of Factors That Evidence The Disorder; III – Rating Of Functional Limitations; Section IV – Consultant's Notes. Adjudicators use these sections to record information that is necessary to evaluate mental impairments. At the administrative law judge hearing the written decision must incorporate the pertinent findings and conclusions based on the PRT. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment. The decision must include a specific finding as to the degree of limitation in each of the functional areas (the "B" Criteria of the Listings): activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 CFR § 414.920(a) (a-e); 3 Soc. Sec. Law & Prac. § 42:140.

Prior to 2000, ALJs were required to complete the PRTF and attach it to their decisions. *Pratt v. Sullivan*, 956 F.2d 830 (8th Cir. 1992)(because the ALJ did not evaluate the evidence properly, the court did not need to address the issue of whether mere failure to complete the form would necessarily constitute reversible error if it were clear from the decision that the ALJ had properly evaluated the impairment.) In *Montgomery v. Shalala*, a PRTF was completed at the initial stage of plaintiff's application for benefits and reviewed and "affirmed as written" at the reconsideration stage. 30 F.3d 98 (8th Cir. 1994). The ALJ did not complete a PRTF at the hearing stage. The Commissioner argued, and the district court agreed, that the ALJ's failure to complete the PRTF was harmless error. The court noted that several appellate

courts (Seventh and Tenth Circuits) have held that an ALJ's failure to complete a PRTF is grounds for reversal. *Id*. at 100. Citing *Pratt*, the court said that the Eighth Circuit has suggested, but not held, that such a failure requires reversal and remand. The court found in *Montgomery* that the failure was prejudicial and remanded for further administrative proceedings. *Id*. In 2007, the Eighth Circuit explained that while the ALJ's analysis must be included within the written decision, use of the PRT Form is not required. *Nicola v. Astrue*, 480 F.3d 885 (8th Cir. 2007). In *Nicola*, there was no evidence of PRT analysis having been performed at any level of the application process, up to and including the ALJ review, and the case was remanded to the Commissioner for further proceedings. *Id*. at 887.

In this case, Plaintiff has a long history of mental impairments, including diagnoses and treatment of depression, anxiety and ADHD. Her treating psychiatrist[5] completed a Medical Mource Statement ("MSS"), indicating marked and moderate limitations to her mental abilities and assigned a GAF score of 50. On July 18, 2007, Agency Specialist Dr. Kay Cogbill completed a PRTF, finding that plaintiff has mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. In his October 11, 2007, Case Analysis, Agency Specialist Dr. Brad Williams reviewed all of the evidence and affirmed Dr. Cogbill's assessment as written. In October of 2008, ALJ Larry Shepherd reviewed the medical records, including those from the treating psychiatrist and a consultative mental examiner, and determined after a hearing in which plaintiff, her best friend, and a vocational expert testified, that Plaintiff had severe impairments of depression, anxiety disorder and ADHD and that she can perform unskilled work where interpersonal contact is incidental

---

[5] The Court assumes, for purposes of this discussion, that Dr. Price was Plaintiff's "treating physician." He only saw Plaintiff on two occasions.

to the work performed. The ALJ declined to give controlling weight to the treating psychiatrist's opinion because it was inconsistent with treatment records showing plaintiff was doing well on her medications and her activities of daily life (including attending college) were not consistent with debilitating depression and anxiety.  The ALJ found the evaluation of the consultative examiner more reliable; Dr. Nichols found plaintiff to be cheery and positive.  At the end of his  credibility analysis, the ALJ wrote that he had "considered and essentially concur[red] with the opinions of the state agency consultants who provided assessments at the initial and reconsideration levels and note[d] that they also support[ed] a finding of 'not disabled.'"

Plaintiff argues that the ALJ erred in failing to use the special procedure mandated by the Commissioner's regulation in evaluating plaintiff's mental impairments, i.e.,  he did not make specific findings as to the degree of limitation in each of the functional areas.  Pl.'s Br. at 4.  Plaintiff contends this is reversible error.

The Commissioner acknowledges that the ALJ is required to incorporate in his decisions the pertinent findings and conclusions based on the PRTF, and that the ALJ failed to do so in this case.  D.'s Br. at 5.  It is his position that the PRTF is used to determine whether the claimant has a severe impairment at step two of the sequential evaluation process; the ALJ properly determined that plaintiff had the severe mental impairments that she alleged; the ALJ explicitly considered the findings of the state agency medical consultants which included a PRTF; therefore, the failure to incorporate in his decision the pertinent findings and conclusions based on the PRTF constitutes harmless error.  The Commissioner goes on to describe the Eighth Circuit's standard for harmless error, but the cases cited do not address harmless error with respect to PRTFs.

Given the imperative language of the regulation ("…the written decision *must* incorporate the pertinent findings and conclusions based on the technique"), emphasis added, it is tempting to find that, as in *Montgomery* and *Nicola*, the failure is grounds for reversal. However in this case, unlike the others, the PRTF was performed at the consideration and reconsideration levels, and was available to the ALJ to review.  He did so and concurred with the agency's findings.  If an agency has failed to adhere to its own procedures, this Court will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapse.  *See Rabbers v. Commissioner Social. Sec. Admin*, 582 F.3d 647 (6th Cir. (Mich.) 2009).  First, the ALJ's failure to rate the B criteria at step two of the five-step analysis was clearly harmless.  Notwithstanding this error, the ALJ ultimately concluded that Plaintiff had severe mental impairments and went on to step three, which was all Plaintiff could have hoped for.  Secondly, even if the ALJ had made specific findings regarding the B criteria, he would have reached the same conclusion at step three:  that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.

As to the first of the four B criteria, the record clearly indicates that Plaintiff did not have a marked restriction in her activities of daily living.  Activities of daily living "include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for…grooming and hygiene, using telephones and directories, and using a post office."  20 C.F.R. pt. 404, subpt. P, app 1, § 12.(C)(1).  Although the ALJ did not make a specific finding regarding Plaintiff's degree of limitation in this functional area, his written decision did refer in detail to her testimony and the findings of Dr. Nichols' consultative evaluation:

A case manager comes to her house twice a week and she goes every two weeks to see her counselor. The claimant gets to see her girls each Wednesday. Reading is her hobby. She watches TV with her father in the morning. She does laundry once in a while, and she cleans her room. Her mother does her shopping for her. She goes over to her friend Jessie's house to watch TV at least once a week. The claimant has a driver's license with no restrictions….Dr. Nichols found the claimant alert and fully oriented and noted that she reportedly left the home daily to socialize despite the fact that she reported symptoms of recurrent panic attacks that appeared to be mostly random. T. 52 – 53.

Dr. Nichol's report indicated that based on the claimant's alleged mental symptoms, moderate impairment of activities of daily living should be expected. T. 269. Doctors Cogbill and Williams assessed mild restriction of activities of daily living. T. 285. Although the Medical Source Statement completed by Dr. Price was more favorable to Plaintiff—rating all her "basic demands of work" criteria as either moderate or marked, it is still insufficient to show that Plaintiff suffered a marked restriction when the record clearly shows that Plaintiff's conditions did not seriously interfere with her ability to function on a daily basis. T. 326-328.

Regarding the second of the four functional areas, the record does not indicate that Plaintiff had marked difficulties in maintaining social functioning. Social functioning involves a claimant's "capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals." 20 C.F.R. pt. 404, subpt. P, app. 1, §12.00(C)(2). Although Plaintiff reported that she suffered panic attacks triggered by going out and by being in small rooms or rooms with lots of people in them, she was attending college, studying office management and making good grades. T. 266. Plaintiff lived with her mother and father, dated (she met a truck driver who wanted to marry her), was described by her counselor as "outgoing", was chatty and animated and interacted in an appropriate and effective manner with Dr. Nichols, and was looking for a job (anyplace but in a factory). T. 15, 248, 256, 267, 244. She made almost daily trips to visit friends in their homes and "texts a lot". T. 18, 266. However, the

evidence also shows that she needed to learn social skills, particularly with respect to family stability and parenting.   T. 257.  Drs. Cogbill and Williams assessed moderate difficulties in maintaining social functioning.   T. 285.   Dr. Price rated her social interaction as moderately limited, except that he found she was markedly limited in the ability to accept instructions and to respond appropriately to criticism from supervisors, the ability to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and the ability to set realistic goals or to make plans independently of others.  T. 327 – 328.  Plaintiff testified that she used to work for her grandparents, but that they "couldn't handle [her] mood swings any longer." T. 51.  She also reported anxiety and irritability with regard to her relationship with her children. T.  228, 330.  Currently her oldest child lives with his father and her two girls are in the custody of the State.  T. 15.  Although the evidence suggests that plaintiff sometimes found it difficult to get along with others, it does not show that her conditions seriously interfered with her ability to maintain social functioning.  The ALJ did not discount all of Plaintiff's subjective complaints and recognized that she does experience limitations; this is evidenced by his residual functioning capacity finding, that Plaintiff can perform unskilled work *where interpersonal contact is incidental to the work performed*.  T. 51 (emphasis added).

As to the third functional area—maintaining concentration, persistence, or pace—there is no evidence that Plaintiff suffered marked difficulties.  This area involves "the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(3).  Plaintiff testified that she left college because she couldn't concentrate enough on what was going on and that she sometimes had problems remembering what she had previously read.  T. 17 – 18.  Drs. Cogbill and Williams assessed moderate difficulties in maintaining

concentration, persistence or pace.  T. 285.  Dr. Price found Plaintiff to be moderately limited in her ability to carry out short and simple instructions, the ability to sustain an ordinary routine without special supervision, the ability to work in coordination with or proximity to others without being unduly distracted by them, and the ability to make simple work-related decisions. T. 327.  He found her to be markedly limited in the ability to carry out detailed instructions, the ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  T. 327.  The records indicate that Plaintiff is compliant with her medication, that she suffers no side effects and that the medications are successful at reducing her anxiety, improving her attention, and decreasing her depression.  T. 51 – 52.  There is no evidence that indicates Plaintiff has marked difficulties in maintaining her concentration, persistence, and pace as a result of her conditions.

Finally, with respect to the last of the four functional areas, the record shows that plaintiff suffered no episodes of decompensation.  Episodes of decompensation "are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  20 C.F.R. pt. 404 subpt. P, app. 1, § 12.00(C)(4).  They "may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)."  *Id.*  "The term *repeated episodes of decompensation, each of extended duration*…means three episodes within one year, or an average of once every 4 months, each lasting for at least two weeks."  *Id.*  Here, Plaintiff was taken to the emergency room on April 12, 2007, after

17

allegedly suffering an anxiety attack at parenting class.   T. 261.   A routine urinalysis was performed; Plaintiff was given two milligrams of Ativan and sent home.   In the medical source statement, Ms. Martaus wrote that Plaintiff's panic attacks cause temporary paralysis in both hands and fact.   T. 328.   The Plaintiff has not alleged, and this Court does not find, that any of her panic attacks rose to the level of episodes of decompensation.   Thus, the record does not show that Plaintiff suffered from repeated episodes of decompensation, each of extended duration.

The Court holds that the ALJ's failure to rate the B criteria, while error, was harmless in this case.

## B.  The ALJ Properly Evaluated Opinion Evidence

The Plaintiff next argues that the ALJ failed to give appropriate weight to the opinion of the treating specialist and failed to state what weight, if any, was given to the opinion of this treating specialist.   She further argues that the ALJ improperly preferred the opinion of a one-visit non-treating consultative examiner over the opinions of the treating mental health professionals.   Pl.'s Br. at 4.

The Court recognizes that "a treating physician's opinion is generally entitled to substantial weight"; however, such an "opinion does not automatically control in the face of other credible evidence on the record that detracts from that opinion." *Johnson v. Astrue*, 628 F.3d 991 (8th Cir. 2011); *Heino v. Astrue*, 578 F.3d 873, 880 (8th Cir. 2009) (internal quotations and citation omitted). "Moreover, an ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence." *Id.* at 879 (internal quotations and citations omitted). When deciding "how much weight to give a treating physician's opinion, an ALJ must also consider the length of the

treatment relationship and the frequency of examinations." *Casey v. Astrue*, 503 F.3d 687, 692 (8th Cir. 2007). "When an ALJ discounts a treating physician's opinion, he should give good reasons for doing so." *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007) (internal quotations and citation omitted);  *Brown v. Astrue*, 611 F.3d 941, 951-952 (8th Circ. 2010).

Although Plaintiff argues that Dr. Price's opinion should be given controlling weight because he was a treating specialist, the ALJ's analysis was consistent with the Commissioner's regulations, which provide that a treating physician's opinion is given controlling weight if, and only if, it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.   20 C.F.R. § 404.1527(d)(d); *Johnson v. Astrue*, 628 F.3d 991, 994 (8t Cir. 2011).   Here, the ALJ afforded less weight to the MSS of Dr. Price, finding that his opinion "is not well supported by the overall evidence of record." T. 53.

Plaintiff argues that the ALJ impermissibly relied on opinions of state agency physicians who did not examine her.  Pl.'s Br. at 7.  Throughout his opinion, the ALJ took note of thirteen specific discrepancies between Dr. Price's opinion and the objective medical evidence:  (1) Mental health records show Plaintiff was doing well and had good responses to medications.  T. 51.  (2) Claimant acknowledged that her anxiety was reduced by Ativan.  T. 51.  (3) Claimant acknowledged that her attention improved with Adderall.  T. 52.  (4) Claimant acknowledged that her symptoms of depression decreased on Effexor.  T. 52.  (5) There is evidence that her anxiety attacks seem to be in part related to custody issues as a result of separation from her husband.  T. 52.  (6) The record shows that claimant continues to drive, cook, shop, and do some housework.  T. 52.  (7) Dr. Austin noted she was attending college and was making good grades.  T. 52.  (8) Claimant suffered no adverse side effects from her medication.  T. 52.  (9) Ms.

Martaus described claimant as energetic and outgoing.  T. 52.  (10) With Dr. Nichols, claimant was chatty, cheery and animated, joking and making quips.  T. 52.  (11) Claimant told Dr. Nichols that she left home daily to socialize.  T. 53.  (12) With Dr. Nichols, her interview affect was relatively stable and did not show any significant depressive symptoms.  T. 53.  With regard to opinion evidence, the ALJ determined:

> Dr. Price found the claimant had marked limitations; however, the record indicates that the claimant responded well to medication, acknowledged reduced anxiety and improved attention, and reportedly maintained good grades while attending college level course during treatment.  The undersigned finds the mental status evaluation by Dr. Charles Nichols on June 27, 2008, is more reliable and entitled to greater weight.  Dr. Nichols found that the claimant's mood and affect did not match her allegations of depression and anxiety.  He stated that in fact she was quite cheerful.  In addition, he found the claimant alert and fully oriented.  Further, he noted she reportedly left home daily to socialize, despite the fact that she reported symptoms of recurrent panic attacks that appeared to be mostly random.

> A treating physician's checkmarks on an MSS form may be discounted if they are

contradicted by other objective medical evidence in the record.  *See Stormo v. Barnhart*, 377 F.3d 801, 805-806 (8th Cir. 2004); *Hogan v. Apfel*, 239 f.3d 958, 961 (8th Cir. 2001).  The ALJ did not impermissibly rely on the findings of the state agency physicians; the ALJ properly assessed Plaintiff's RFC based on all of the relevant evidence, and there is substantial evidence in the administrative record to support the Commissioner's conclusions.

**C.     Substantial Evidence Supports the ALJ's RFC Assessment and the ALJ's Determination That Plaintiff Can Perform Other Work That Exists in Significant Numbers in the National Economy.**

A claimant's RFC is the most she can do despite her limitations.   20 C.F.R. § 404.1545(a)(1).   The ALJ determines a claimant's RFC based on "all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's

own descriptions of his or her limitations." *Masterson*, 363 F.3d at 737.  The Eighth Circuit

has stated that "a claimant's residual functional capacity is a medical question." *Lauer v. Apfel*,

245 F.3d 700, 704 (8th Cir. 2001).  Thus, although the ALJ bears the primary responsibility for

determining a claimant's RFC, there must be "some medical evidence" to support the ALJ's

determination. *Eichelberger v. Barnhart*, 390 F.3d 584, 591; *Dykes v. Apfel*, 223 F.3d 865, 867

(8th Cir. 2000).  The Court notes that Plaintiff appears to place the burden of proof on the

Commissioner.  It is the claimant, however, who bears the burden of proving her physical

restrictions and/or residual functional capacity.  See *Geoff v. Barnhart*, 421 F.3d 785 (8th Cir.

2005). In developing the record, the Commissioner is required to obtain additional medical

examinations and/or testing only if the record does not provide sufficient medical evidence to

determine whether the claimant is disabled.  See *Barrett v. Shalala*, 38 F.3d 1019 (8th Cir.

1994)(citing, in part, 20 C.F.R. 404.1519a(b)).  *See also Dozier v. Heckler*, 754 F.2d 274(8th

Cir. 1985)(reversible error not to order consultative examination when such evaluation is

necessary to make informed decision).  20 C.F.R. 404.1519a(b) identifies several instances in

which additional medical examinations  and/or testing is warranted.  They include the

following: (1) where the additional evidence needed is not contained in the records of the

claimant's medical sources; or (2) where a conflict, inconsistency, ambiguity, or insufficiency

in the evidence must be resolved and the Commissioner is unable to do so by re-contacting the

medical sources.

     Plaintiff suggests that the ALJ relied too heavily on indications in the medical record that

Plaintiff was doing well.  She cites *Hutsell v. Massanari* for the proposition that "doing well" for

the purposes of a treatment program has no necessary relation to a claimant's ability to work or

to her work-related functional capacity.  259 F.3d 707, 713 (8th Cir. 2001).  Ms. Hutsell was a

chronic schizophrenic with a history of hospitalization for psychotic episodes, whose two consultative examinations resulted in findings that her capacity for sustained employment was nonexistent.  *Id.* At 712.   Evaluating mental impairments is often more complicated than evaluating physical impairments. *Obermeier v. Astrue*, Civil No. 07–3057, 2008 WL 4831712, at *3 (W.D.Ark. Nov. 3, 2008). With mental impairments, evidence of symptom-free periods does not mean a mental disorder has ceased. *Id*. Mental illness can be extremely difficult to predict, and periods of remission are usually of an uncertain duration, marked with the ever-pending threat of relapse. *Hutsell v. Massanari,* 259 F.3d 707, 711 (8th Cir.2001). Given the sometimes competitive and stressful conditions in which people work, individuals with mental impairments "may be much more impaired for work than their signs and symptoms would indicate." *Id*.; *Obermeier*, 2008 WL 4831712, at *3. Worse yet, efforts to combat mental illness present their own unique difficulties. *See Pate–Fires v. Astrue*, 564 F.3d 935, 945 (8th Cirl 2009). Individuals with mental illness often refuse to take their psychiatric medication-a symptom of the illness itself, rather than an example of willful noncompliance.  Here, Plaintiff has remained compliant with her medications, which have no side effects, and which have resulted in consistently improved anxiety, depression, attention span, appetite and sleep.  "If an impairment can be controlled by treatment or medication, it cannot be considered disabling."  *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004), quoting *Roth v. Shalala,* 45 F.3d 279, 282 (8th Cir. 1995).

In this case, the ALJ did not find that Plaintiff's mental impairments had no effect on her ability to work.   Instead, he concluded, based on the medical records and testimony, that Plaintiff's mental impairments require a work setting where interpersonal contact is incidental to the work performed.  T. 51.  As discussed above, there is substantial evidence in the record to support the ALJ's conclusion.

After finding that Plaintiff was unable to perform her past relevant work, the ALJ properly relied on vocational expert testimony to determine whether Plaintiff can perform other work available in the national economy.  T. 37.  *See* 20 C.F.R. §§ 404.1566(e), 416.966(e) (in determining disability, the Agency may use vocational expert testimony to determine whether a claimant can perform other occupations). The ALJ asked the vocational expert the following hypothetical question:

> Please assume a younger individual with a high school education, who has no exertional limitations.   The individual can perform unskilled work where interpersonal contact limited to the work performed.   Would there be jobs available for this individual to perform?  T. 37.

The Vocational Expert responded that the hypothetical individual would be able to work in three unskilled occupations:  dishwasher (of which there are 4200 jobs in Arkansas and 502,700 in the U.S.), housekeeper (of which there are 1700 in Arkansas and 201,000 in the U.S.) and small products assembler (of which there are 1500 in Arkansas and 74,000 in the U.S.).   The dishwasher position is classified as medium exertion, and the housekeeper and assembler jobs are light exertion.  T. 37.

Plaintiff's counsel asked the VE a question including the limitations documented by Dr. Price[6].   The VE responded that there were no jobs that could be performed with those limitations.  T. 38.

The hypothetical question posed by the ALJ in this case incorporated each of the impairments that the ALJ found to be credible, and excluded those impairments that were

---

[6]Q:  Ms. Moore, using the definitely (sic) of markedly impaired to be, in a vocational setting, the individual cannot be expected to function independently, appropriately and effectively in the designated area on a regular and sustained basis, i.e., eight hours a day, five days a week, or a credible work schedule, and with that definition of markedly impaired, the question, then, would be the ability to complete a normal work day and work week without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and  length of rest periods, with such a limitation, could a person be expected to hold down any job?
      A.   No, sir.

discredited or that were not supported by the evidence presented (as discussed *supra*).  The Eighth Circuit has held that "an ALJ may omit alleged impairments from a hypothetical question posed to a vocational expert when '[t]here is no medical evidence that these conditions impose any restrictions on [the claimant's] functional capabilities;" or "when the record does not support the claimant's contention that his impairments 'significantly restricted his ability to perform gainful employment.'"  *Owen v.* Astrue, 551 F.3d 792, 801-802 (8th Cir. 2008)(quoting *Haynes v. Shalala*, 26 F.3d 812, 815 (8th Cir. 1994).   Accordingly, the ALJ's determination that Plaintiff could still perform work that exists in significant numbers in the national economy is supported by substantial evidence.

**V.    Conclusion**

Having carefully reviewed the record, the undersigned finds that substantial evidence supports the ALJ's determinations at each step of the disability evaluation process, and thus the decision should be affirmed.   Accordingly, Plaintiff's complaint should be dismissed with prejudice.

ENTERED this  11th day of August, 2011.

/s/ J. Marschewski

HON. JAMES R. MARSCHEWSKI
CHIEF U.S. MAGISTRATE JUDGE